DOLORES CABRERA WIDOW OF MELÉNDEZ ET AL., Petitioners, *v.* INDUSTRIAL COMMISSION, Respondent; STATE INSURANCE FUND, Intervener.

No. 557. Decided March 16, 1962.

*Hernán Morales Landrau* for petitioner Dolores C. Meléndez. *Donald R. Dexter* and *Carmen Ana Archeval* for the State Insurance Fund.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos and Mr. Justice Santana Becerra.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

The workman Ismael Meléndez Mateo suffered a fall from the roof of a house at an altitude of approximately 12 feet while he was working. The accident occurred on August 31, 1956. That same day he was hospitalized and on September 18 he was discharged by the State Insurance Fund. On October 1, the Fund confirmed said discharge and the workman appealed to the Commission alleging that he could not work. He was examined at a medical hearing on October 22 and on that date the Fund considered him cured without any disability. On November 13 he was again examined at a medical hearing and the case was sent to the Fund for new X-rays of the thorax. He was again examined on November 14 and on November 23, 1956 the Commission decided that the workman had been cured without any disability. Three and one half months later, on March 16, 1957 he died. He was 49 years of age.

The State Insurance Fund denied compensation to his widow and to other dependents on May 1, 1958. On August 29, 1958 the respondent Commission passed judgment affirming the Manager and denying compensation for this death. This judgment is now before our consideration.

There is no dispute as to the dependency. Neither is there any controversy as to the fact that the workman, a

mason by trade, suffered the fall from the roof of that house during the course of his employment with the Fullana Construction Corporation. The case revolves fundamentally on the causal relation between the death and the labor accident. In this proceeding petitioners attack the conclusion of the respondent Commission, based on the medical evidence, to the effect that the death had nothing to do with the accident. It it indispensable, therefore, that we make a detailed exposition of the evidence in the record.

Dr. Andrés Meléndez testified that the workman was hospitalized in his clinic, having been sent by the practitioner José Santana on August 31, 1956—the day of the accident —because of the numerous contusions that he had received in his head, thoracic region, right hip, and in both arms. X-rays were taken of the head, of the chest to photograph the ribs, of the hip and the arms and they showed no fracture. They showed that the workman had a severe distortion of the spinal column which was not produced by the accident and which constituted a congenital deformity. The workman was given a treatment of aspirin and ice packs and he was not relatively so ill nor was he at any time in a serious condition. Upon admission, he mostly complained of pain in his *chest* and *head*, as well as in his arms and hip. His blood pressure was 100/60. No urine or blood tests were made because they are not done unless required. They found only the kyphosis deformity or distortion, and Dr. Meléndez referred to the text of the following annotation by the X-ray technician: "This patient has deformed body and it prevents him from cooperating in taking X-rays plates." She explained that the cervicals instead of being straight, formed a 90° arch to the left and another angle to the right forming a kyphosis. Respecting his liver Dr. Meléndez stated that he did not notice any abnormality. He did not see this workman again after he left the clinic.

A witness named Pedro Angel López testified that he used to take the workman daily to his work and also brought

him back home in his car until the day of the accident. Then he saw that he could not work, he had bulging eyes, and he would become insane, explaining that he saw him often running after his children and that one night he threw them out of the house.

The widow stated that she had been married to the workman for 22 years; that she considered him a healthy man because he did not miss a day of work; that after the accident his health began to fail considerably because he could not work; that on the day of his death she took him to the District Hospital because he had a severe pain, whereupon he was given an appointment for the 21st or 22d of that month, and she brought him back home where he died about two hours later. Explaining the condition of the workman after the fall she stated that before the accident he was a person who had always dislike loud talking "and after the accident he came in breaking and throwing out the window and throwing us out the house." At such times she was compelled to go out into the streets with her children. He would put his hands "like this" and suddenly he would ask what was the matter with him, and why had he thrown them out. The man was sick and he was depressed because he could not work. He would tell his children that he regretted to see them go hungry while he was unable to work. His eyes grew black and he did not have them that way before and became red inside an bulged out. Since that fall he "was through forever." The widow also testified that the workman went to the doctor every six months to have X-rays taken and he was never told that he was suffering from a heart condition. He was not often absent from work.

The State Insurance Fund presented the testimony of Dr. Carlos Eugenio Timothée, a heart specialist. He stated that on March 6, 1957, the workman went to the District Hospital of Bayamón and he was examined at the heart clinic which he directed. From the examination it was concluded that the patient suffered from "cor pulmonale" which

meant a heart affected by a pulmonary condition. It was also found that the patient had hypertension of the pulmonary artery. Explaining the causes which brought about the "cor pulmonale" Dr. Timothée stated that chronic "cor pulmonale," such as in this case, is caused by bronchial asthma, emphysema, or by weakening diseases of the lungs; in other cases by a pulmonary disease, in still others, by pulmonary endarderitis which meant an inflammation of the interior of the pulmonary artery, and in the majority of cases, where a great deformity of the thorax exists as for example, a deformed chest or *"kyphoscoliosis."* He stated that *"kyphoscoliosis"* produces the "cor pulmonale" because it causes such a great deformity in the thoracic wall that the heart grows oppressed, it is deprived of the space allowance it should have and thus there is lacking the vital capacity of the heart or of the lungs. Explaining that both organs work in unison, the one purifying the blood and the other pumping it, where the thoracic cavity has such an enormous deformity there is an additional pressure on the lungs and the heart, then the heart functions at a tremendous disadvantage, shortening the person's life span, and considerably reducing the average life expectancy. Persons having *"kyphoscoliosis"* which causes the "cor pulmonale" live much less than a normal person in equal circumstances. The doctor went on explaining that this workman's X-ray plates were studied, that he had an electrocardiogram and urine analyses made; that the patient was not hospitalized, and that he never returned. A note in the record explained that the patient had been referred to the Public Welfare Unit for economic aid since he was mostly interested in economic aid "because he felt ill and could not work." The physician testified that the X-ray report stated that the image in both the right and left lungs indicated "enlargement of the stroma * which denoted pulmonary congestion"

* *Casares*—The framework of tissue which serves to support the cellular material. *Diccionario Ideológico.*

and that an exaggerated *"kyphoscoliosis"* was present. Ten days after this examination the workman died.

The medical expert was informed of the workman's fall, of the bruises he received, and of his death some 196 days later, and his opinion having been asked considering these facts, as to the causal relationship between the death and the accident suffered, Dr. Timothée stated:

"I do not believe that there is any relation between the accident and the death of the workman. Reasons: The workman suffered a trauma. This trauma was not sufficiently severe to cause him osseous pathology, according to the X-ray plates. We know that in an elderly person, for a trauma to affect the right ventricle, there must be a fracture of the ribs, there must be a tear of the pleura, or a puncture of the lung. In this case these pathological requirements have not been met.[1]

"Q.—Therefore, you believe Doctor, that the accident suffered by the workman had nothing to do with his death, and that he would have died irrespective of the trauma he suffered, with the deformity in his body?

"A.—We believe so. And the patient's history upon going to the District Hospital: He is treated, he requests economic aid and then leaves, dying ten days later. It seems to

---

[1] At this point Dr. Timothée quoted for the record the following excerpt from a book by Dr. Paul D. White on heart diseases, which because of its professional nature we copy verbatim:

"Thoracic and Spinal Deformities: An appreciate and sometimes serious handicap to the action of the heart and circulation may be occasioned by deformities of the thorax or spine, particularly marked kyphoscoliosis. The strain, however, may be more pulmonary than cardiac with such diminished vital capacity of the lungs, but almost always both systems, respiratory and circulatory, are involved with resultant pulmocardiac failure (Chapman, Dill & Graybiel, 1939). The heart may be displaced (to the left with right scoliosis and to the right with left scoliosis) and deformed and the great vessels compressed so that left ventricle or right ventricle, or both, may have increased work to do, with resulting hypertrophy and dilatation. Or the restriction of thoracic movement in respiration may result in special strain on the right ventricle, such as occurs in the case of the cor pulmonale. In badly deformed individuals survival or old age is frequently prevented by the cardiovascular strain as well as by pulmonary complications."

us that this is the picture of all those heart patients in the last stages of their disease.

"Q.—And respecting the time elapsed, that is, 196 days, between the accident and the death of the workman?

"A.—In the case of a trauma which injured the heart, death would follow quickly.

"Q.—Do you believe he could have survived?

"A.—Never. He could not have survived with that chest and a fracture in that thoracic cavity, with an injury to the right verticle or affecting the lung, or pressing on the great blood vessels. That would have been a condition incompatible with life."

. To petitioner's questions: "Q.—In your opinion, the workman's death had nothing to do with the fall which he suffered? A.—The workman's death? Q.—It was not the result of the fall which he suffered? A.—I am speaking in respect to the heart. The heart was not affected by the fall. Q.—Then you mean to say that the fall did not affect his heart? A.—In other words, his death because of heart failure by a cardio-respiratory process would have occurred with or without the fall." He also explained that the pressure which the thoracic cavity exerted on the heart raised the workman's intra-pulmonary pressure; that it is not measured because a complicated investigation would be necessary, it is known by symptomatology; he had pulmonary hipertension.

Asked by the Commission on the condition of the liver as compared to the condition which Dr. Meléndez exposed, the physician stated that it was not found it had any pathology, it was enlarged, which is normal in all cases of heart disease; in cases of heart disease where the right ventricle is affected, there is passive congestion of the liver because the blood does not flow forward, but flows backward, and the organ becomes congested. As to whether that condition could be the result of the trauma, he explained that this man had a lung affected by the pressure which it had always suffered and a heart which was overworked due to the compression to which it had

always been subjected, and the liver was included in the picture as part of a synchronized mechanism. Consequently he was asked whether or not the condition which he found could have been brought about by the accident, to which he answered: "If the injured patient would have had any acute symptomatology immediately after the accident, if he would have died right after the accident, we could believe that the accident had something to do with it. But since 186 days elapsed, six months, and there was no puncture of the lung and the pleura has not been torn, nor the ribs fractured, nor is there any evidence indicating that the thoracic cavity suffered a strong commotion, we are bound to conclude that the accident was not the cause of the death."

The Medical Director of the Commission, Dr. Vázquez Milán, stated that the case was somewhat obscure considering that they did not have the help of an autopsy nor any information of radiological or laboratory examinations to corroborate the doubtful points such as the hepatic condition, since Dr. Meléndez (right after the accident) had found said hepatic condition to be negative and in a report of the District Hospital it was stated that there was an enlargement of about two fingers under the right costal rim. The doctor referred to the congenital deformity of the workman but noted that up to the age of 49 the workman had worked eight hours per day without history of hospitalization for treatment of any disease. Medically it was known that his cardiovascular physiology had to be affected given the nature of the bone structure of his skeleton, but there were no signs that such physiology was altered since it had been gradually compensated by the physical development of the person, probably reaching its maximum functioning without apparent signs of alteration. That there was a history of trauma; that the workman falls from an altitude of 12 feet from the roof of a house and felt a pain in his chest and head and superior extremities; he had been discharged on the ground that the X-rays examinations were negative

of traumatic osseous pathology, actually he had a grave osseous pathology in his spinal column and his rib arches on account of the congenital deformity "of the pigeon-breast type" due to the above-mentioned kyphoscoliosis.

The Medical Director of the Commission continued explaining that the pathology alleged by the workman during the time from the fall up to his death was the same, and it was up to the clinical physician to determine whether or not this was a mental condition. If it were a post-traumatical mental question, considered by one of the doctors as a state of compensatory psychosis,[2] it could be alleged, in the absence of clinical symptoms, that a sudden mental condition ensued. And he continued: "However, from the other viewpoint, it is something pathophysiological which does not have a clinical explanation, which my colleague Dr. Timothée nor any other doctor could have given, no matter how expert he might be, which would alter that state intensifying its pre-existent condition, increasing its incapacity, to the point of inducing his death several days or months later, due to aggravation, if the other aspect remains pending. There are two aspects: one compensating the workman from the viewpoint of aggravation. . . . That is why I say it remains pending that the workman be compensated from the viewpoint of aggravation. From the size of the liver as found on the day of the examination and from the clinical record of Dr. Timothée, as Director of the Cardiological Center of the District Hospital, it was obvious there was a marked enlargement of the liver, as corresponds all cases of 'cor pulmonale.' Those two things run parallel. The physiology of the heart, altered by the backward circulatory pressure, instead of forward, as in the cases of hypertension, the pressure is backward and the liver is congested. That is why the 'cor pulmonale' condition runs parallel with hepatic hypertrophy. That hepatic condition could not have been

---

[2] Annotation of compensatory psychosis made in the clinical record by an intern of the District Hospital, with which Dr. Timothée disagreed.

found before, right after the accident, by Dr. Meléndez, who examined him. Therefore, it could have become acute or aggravated within a period of several months after the accident. Or is it that this was a condition that was the final events of his life? If it was the final event of his life, it is not compensable in the sense of his death. But there was the other aspect. The aspect that if the workman was exaggerating, feigning an inexistent condition, it was a compensatory neurosis produced by trauma. In my opinion that is a compensable condition."

To the questions by the State Fund as to whether or not the workman's death was due to an hepatic condition, the doctor answered that the death certificate stated that he died of heart trouble; the hepatic condition was rather secondary, not the direct cause of death, but since "cor pulmonale" was mentioned, that had to be pointed out because that is the manner in which the clinic "measures the degree." "Q.—In a person said to have died of a cardiac condition, what difference does it make whether his liver is more or less congested if that is not the direct cause of his death? A.—His life depends on the size of that liver. Because a tremendously large liver with a heart which is apparently functioning fairly well, is bad. Whereas a heart might be considerably affected yet if the liver is healthy, he may live longer."

Dr. Timothée, when called again to testify, stated that in a case of "cor pulmonale" he would not grant importance to the hepatic condition because it was a condition per se. It had to exist; it was part of the pathological process. "In the District Hospital of Bayamón the patient was found to have that hypertrophy, that passive congestion of the liver. When he went to the District Hospital the pathological process was much more advanced than at the time he was previously examined. So much so, that he died only ten days later." In his opinion the question was whether or not that thoracic deformity present during so many years, injured

that heart so that it took away the life of the patient, considering that the victim was nearing the age of 50 and that very seldom a heart patient who has had a disease during many years passes that age. The victim's death was due to a cardio-respiratory condition caused by the overweight on that heart, specially on that right ventricle during so many years. Finally he stated that he believed the mental capacity of the workman had not been affected; he did not believe that the workman's complaints that he had been injured and could not work were a post-traumatical compensation psychosis. It was "the natural condition of every human being who receives an injury in a section which is already injured or diseased for many years."... "Psychosis is an obsession. A person suffering of psychosis can speak of nothing else. He says he is disabled; that he cannot work because of this or the other thing. He associates everything with that injury. However, if the man feels a pain in his chest, or feels fatigued and says: 'this must be due to the injury I received,' that is not psychosis."

In that respect, Dr. García Estrada was also of the opinion that the workman did not impress them as having any mental disease, upon discharging him they did not notice that he had any emotional problems, neuroses or psychoneuroses. During the whole course of the case he failed to notice any psychosis. The plates did impress them, however.

Dr. Plácido Torres certified his death was due to heart failure. His testimony was not contained in the record but according to the Commission, Dr. Torres did not treat the workman, nor know him in his lifetime, and he certified his death on the basis of information furnished by the victim's family.

That is the picture which, respecting medical opinion, is presented in this case in which the Commission concluded:

"The workman suffered the accident on August 31, 1956, and since the X-ray plates did not show any evidence of osseous pathology in the head, nor the chest, arms nor hips, after adequate treatment, he was discharged from the Hospital on September 18 of the same year, and a certificate was given him to work and to receive treatment during nonworking hours on the 28th of that same month and year. That permit was confirmed by this Commission. Afterwards, on October 22, 1956, the workman was discharged as cured and without disability, a discharge which was also confirmed by our resolution of November 23, 1956, after having ordered new X-ray studies of the spinal column, which results were negative.

"This occurred on November 23, 1956. We heard no more from the workman. He never again went to the State Insurance Fund nor came before us to make allegations of any kind whatsoever, and it was not until March 14, 1957, that is, about four months later that the workman went to the District Hospital of Bayamón where he was examined by Dr. Carlos E. Timothée, whose brilliant and clear exposition of the condition in which he found that patient, has given us sufficient light to decide this case.

"Said medical expert stated that the condition of congenital thoracic deformity from which the patient suffered, put pressure on his heart and lungs, in such a way that his death could occur at any moment, with or without a fall.

"After analyzing all the medical evidence we are of the opinion, that the accident which the workman suffered had nothing to do with his death, nor did it aggravate a pre-existing condition which hastened his death, rather the same was due to natural causes because of his condition."

If anything, what is proved beyond any doubt by the medical testimony in the record, under the circumstances of this case, is the difficulty which we must often encounter in order to decide, under criteria which are not specifically of clinical concern, work-compensation cases of this nature. A death due to heart disease was certified by a physician who did not treat or was acquainted with the patient during his lifetime. There is no autopsy to prove in a conclusive manner the cause of the workman's death on that particular day.

There is no *post mortem* examination of his lungs, nor of his heart, organs which according to the record particularly presented a history in the life condition of this person. It is known for a fact, that ten days before dying, a diagnosis is made of a heart affected by a chronic pulmonary condition "cor pulmonale" a disease attributed to the congenital deformity of the workman in his thoracic configuration; and hypertension of the pulmonary artery is also diagnosed. It is known in fact that at this time the X-ray examination shows that the image of the right and left lungs indicated exaggeration in the estroma revealing pulmonary congestion. It is also known that the workman had suffered a fall from the roof of a house from an altitude of twelve feet more or less, and in fact, he worked no more.

To add to the difficulties, there is no description in the record of how the workman's fall came about, of the position of his body upon hitting the ground or which part of the body received the impact of the blow. When he was examined upon his admission right after the accident he complained of pain in his head and in his chest. Despite the pain in the chest, and of the discovery of his thoracic defect, he had no blood nor urine analyses, nor electrocardiograms made, nor is there any X-ray report of the heart or of the condition of the lungs particularly when all this could have been a great help, as a basis of comparison with the state in which the workman was found nearing the time of his death, in determining whether or not there developed with the accident an aggravation of his unfavorable, chronic condition of the lungs and of the heart, or whether the accident could have been, if the simile is permitted, the catalytic agent which precipitated that condition towards a fatal end. We can not blame the workman for the lack of expert testimony which would have permitted—the doctors inclusive—to reach conclusions on less conjectural grounds as to the relationship between the fall and the death which occurred

in a date not so remote from that of the accident, nor could the absence of these elements of judgment be taken to decide in a way unfavorable to him. The workman submitted himself to the State Fund. It was the latter's duty to make the investigations and to order the proper examinations which could have indicated in due time, given the circumstances of this case, that the trauma could not, under any concept whatsoever, aggravate his pre-existing condition hastening it towards a final process which would do away with his life. Apparently the concern of the State Insurance Fund was limited to the existence of bone fractures, and failing to find any, it discharged him as cured.

The medical evidence satisfactorily convinces that the fall did not *directly* cause the death, in the absence of those pathological requirements which would have been necessary, as enumerated by Dr. Timothée, and which if present, in the opinion of the distinguished cardiologist would have created a condition incompatible with life, and his death would have occurred instantly. The evidence in the record, since there could have been more to help one way or another, does not satisfactorily convince us in the light of the rules of law within which these cases should be decided, that the accident did not aggravate the chronic condition of the workman's heart and lungs, product of his congenital deformity, thus precipitating the process, and bringing about his death shortly after, as the respondent Commission affirmatively concluded. Although in our opinion, Dr. Timothée was referring fundamentally to the fact that there was no death *directly* caused by the fall when he stated that there was no relationship between the accident and the workman's death, and that he was bound to die of heart trouble due to his congenital deformity, the physician at no time categorically affirmed that there could have been no aggravation of his condition, or a shortening of his life span, whatever its

length. Even if we were mistaken in interpreting his testimony, the record would always show, at least, a divergence of medical opinion in this respect.[3]

■■■■ Neither the Commission nor we are judges conversant with medical sciences. Hence, we are not qualified to assume the role of the *"third expert"* and merely choose. We have to weigh the divergent opinions, honestly, in the light of all the extrinsic elements of judgment, within our reach, which are reasonable and logical, independently of the elements themselves in conflict.[4] Upon evaluating these elements we must bear in mind a patent reality. The Insurance Fund, as a social fund of a social service, imposed by the modern community, is not selective because the labor ranks are not filled, as those of combat, under selective standards of health excellence. As insurer, the Fund takes the workman as he is, well developed or deformed, healthy or sickly. Thus upon weighing the facts and circumstances of this case and forming an opinion we should proceed not from the effect that that fall might have had on a normal and healthy person, but from its effect on a person with the physical defect and delicate conditions of this workman's heart and lungs. A different criterion would defeat the philosophy itself of this workmen's compensation because it would tend to limit its benefits only to that labor group which at the time of an accident was enjoying a perfect state of health.

■■■ There is a fact, aside from the medical points raised by Dr. Vázquez Milán, which may not be ignored, appealing to reason. With his congenital deformity and the chronic

---

[3] The Fund appeared before this Court and submitted the case on the evidence presented before the Commission.

[4] As stated by POUND, the law grows by judicial application of reason to experience. *"Reparation and Prevention in the Law of Today,"* 12 NACCA Law Journal 197.

condition of his heart and lungs this workman worked normally without a hospitalization history. Then after the fall he could work no more. The physicians of the Fund themselves discarded an emotional condition in the complaint of the workman that he could not work, or an anxiety or compensation neurosis. Dr. Timothée referred to his condition as the natural condition of every human being who receives a blow in a part already injured or diseased for many years. If there was no mental attitude, either conscious or unconscious in the workman, it may logically be assumed, that if he then complained of pain and could work no longer, it was due to an organic impediment created or aggravated by the accident. This and other facts in the record, taken together, permit a reasonable inference or relationship between the fall and the disability and subsequent death.[5] When this workman might have died, if the accident had not occurred, only God knew.

In similar occasions we have given the benefit of such a situation to the workman. *Cf. Cardona* v. *Industrial Commission*, 56 P.R.R. 813; *Colón* v. *Industrial Commission*, 59 P.R.R. 842; *Cordero, Mgr.* v. *Industrial Commission*, 60 P.R.R. 851; *Cordero, Mgr.* v. *Industrial Commission*, 61 P.R.R. 349; *Vélez* v. *Industrial Commission*, 73 P.R.R. 175. We have been examining the decisions published by the respondent Commission and such has also been its attitude in the past, following the rules of liberal application to the workman, of this socially remedial and humanitarian system. It would be tedious to point out those specific cases. "The

---

[5] Interesting indeed, is the relationship of situations which DR. P. BOAS analyzes in his book "Cardiac Injury Resulting from Effort or Trauma: Clinical & Legal Aspects" (1955) particularly the chapter "Injury to the Myocardium and Coronary Arteries induced by *non-penetrating blows to the chest* and by indirect insults" at p. 55 and the chapter "Myocardial infarction induced by a *fall*" at p. 65. Also: *Injury and Heart Disease—Legal Aspects*, article by DR. R. W. KISSANE in 15 Ohio State Law Journal 409 (1954).

cost of the product should bear the blood of the working-man," a statement which is attributed to Lloyd George.

 Aside from the doctrine generally followed, our Legislator, by amendatory legislation of 1957, and specifically indicating the causal relation between the work or occupation and the injury, disability or death, provided that any reasonable doubt with regard to the existence of causal relation that may arise as to the application of the statute, shall be decided in favor of the workman or employee, or his beneficiaries.[6] That is to say, that the lack or absence of causal relation between the work and the injury, disability or death which defeats compensation should arise from the record beyond any reasonable doubt. This concept of the reasonable doubt rules the conscience of the trier upon adjudging the legal rights of the parties; it does not bind the physician in his purely expert conclusions.

 Reasonable doubt is not an arbitrary doubt but a doubt with grounds of reason. In the light of all the facts and circumstances of this case as they appear from the record, there exists a very reasonable and well-founded doubt that the workman's fall, of itself a compensable accident, had nothing to do with his death nor that it aggravated a pre-existing condition which hastened such a result, as respondent affirmatively concluded. Neither does the record show, beyond any reasonable doubt, the complete lack of relation between the workman's occupation and his death.

The judgment appealed from will be reversed, and the case remanded and the death compensated.

---

[6] Act No. 94 of June 22, 1957; 11 L.P.R.A., 1960 Cum. Supp. at p. 6. "This act, being of a remedial character, shall be construed liberally, and any reasonable doubt that may arise as to its application with regard to the existence of causal relation between the work or occupation of the workman or employee and the injury, disability or death, or the occupational character of a sickness, shall be decided in favor of the workman or employee, or his beneficiaries."